Scott A. WOOD, Christopher S.
Wood, and Phyllis Velcheck,
Plaintiffs/Appellants,

v.

CENTERMARK PROPERTIES, INC.,
Defendant/Respondent.

No. 73248.

Missouri Court of Appeals,
Eastern District,
Division Four.

Aug. 4, 1998.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 15, 1998.

Case Transferred to Supreme
Court Nov. 24, 1998.

Case Retransferred to Court of
Appeals Feb. 23, 1999.

Original Opinion Reinstated
March 2, 1999.

518 

SIMON, Judge.

Plaintiffs, the mother and sons of decedent, Barbara Jo Wood (decedent), appeal from a grant of summary judgment in favor of Centermark Properties, Inc. (Centermark) in action for wrongful death resulting from the carjacking, abduction, and murder of decedent by Stanley Hall and others at South County Center (mall), property owned and managed by Centermark.

Plaintiffs contend on appeal that the trial court erred in finding that Centermark owed no duty of care to decedent because: (1) Centermark owed a duty to exercise ordinary care in preventing criminal attacks against decedent under the "Prior Criminal Acts" exception to the general "No Duty" rule; (2) a landlord assumes a duty if it invites its invitees to an area it represents to be secure and there is reliance on those representations; (3) decedent is a third-party beneficiary of the lease agreement between Centermark and Dillard's Department Store (Dillard's); (4) a landlord must exercise ordinary care to make common areas safe for tenants and their invitees; (5) Centermark "enhanced the risk"of danger to decedent by requiring her to park in a remote employee parking area. We affirm.

It is well-settled that when considering an appeal from summary judgment, we review the record in the light most favorable to the non-movant. *ITT Commercial Finance v. Mid–America Marine,* 854 S.W.2d 371, 376 (Mo.banc 1993). Our review is essentially de novo. *Id.* at 376. The criteria on appeal for testing the propriety of summary judgment are no different from those which are employed by the trial court to determine the propriety of sustaining the motion initially. *Id.* The burden on a summary judgment movant is to show a right to judgment flowing from facts about which there is no genuine dispute. *Id.* at 387[9].

William Edward Taylor, Joseph M. Taylor, Taylor & Taylor, St. Louis, for Appellant.

Russell F. Watters, T. Michael Ward, Brown & James, P.C., St. Louis, for Respondent.

A "defending" party may establish a right to judgment by showing: (1) facts that negate any one of the claimant's elements facts; (2) that the non-movant has not been able to produce, and will not be able to produce, evidence sufficient to allow the trier

of fact to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of the facts necessary to support the movant's properly pleaded affirmative defense. *Id.* at 381.

The non-movant must show by affidavit, depositions, answer to interrogatories, or admissions on file, that one or more of the material facts shown by the movant to be above any genuine dispute is, in fact, genuinely disputed. *ITT* at 381. A "genuine issue" exists where the record contains competent materials that evidence two plausible, but contradictory, accounts of the essential facts. *Id.* at 382. A "genuine issue" is a dispute that is real, not merely argumentative, imaginary or frivolous. *Id.*

We initially note that the appellants (plaintiffs) have failed to comply with Rule 81.12(a) which provides, in pertinent part that:

The legal file shall always include, in chronological order: the pleadings on which the action was tried, the verdict, the findings of the court or jury, the judgment or order appealed from, motions and orders after the judgment, and the notice of appeal, together with their respective dates of filing or entry of the record ...

Plaintiffs initially filed a thirteen volume legal file and then filed a supplemental legal file. The file, in its index, failed to separately set out the plaintiffs' first and second amended petition and Centermark's answers. The first and second amended petition are buried in Centermark's motion for summary judgment and again in plaintiffs' exhibits responding to Centermark's motion. Plaintiffs' duty is to provide this court with the record on appeal containing all of the record, proceedings and evidence necessary to the determination of all questions presented. Rule 81.12. We should not have to search through a multi volume file for the pleadings in the case. However, because we were able to discover the information necessary, we will conduct a review.

We review the facts in the light most favorable to plaintiffs. Centermark was the owner and manager of the mall, located in South St. Louis County, on January 15, 1994. Dillard's was a lessee at the mall at the time of the abduction and murder of decedent and is not a party to this action. Pursuant to the terms of its lease with Dillard's, Centermark was to guard and maintain the common areas of the mall. It was Dillard's policy, known to and acquiesced in by Centermark, that Dillard's employees park in remote areas of the parking lot, so as to save the closer parking spaces for store customers.

At 5:45 p.m. on January 15, 1994, decedent, who was scheduled to work at 6 p.m., left her apartment and drove to Dillard's, where she was a part time sales associate. She drove to the designated employee parking area near a light post, approximately 100 yards from the south entrance to Dillard's. At this time, there were security guards on duty at the mall; two were assigned to patrol the parking lot and other outside areas, but no guards were near the location where decedent parked at that time. As she attempted to exit the car, she was accosted by Stanley Hall (Hall), Rance Burton (Burton), and possibly another individual (collectively assailants), who had been in the parking lot for some time and had accosted at least two other women prior to approaching decedent. One of the assailants placed a gun in her back, forced her back into her car and they left the parking lot.

The assailants' plan was to take decedent to the McKinley Bridge where they allegedly planned to set her free. When they noticed that the bridge was crowded with traffic, the assailants drove around St. Louis for at least an hour before returning to the bridge. The assailants drove the car to the middle of the bridge, stopped and then ordered her to exit the vehicle. As she struggled with her assailants and pled for her life, Burton shot her four or five times in the chest. She then grabbed Hall, pleading for him to help her as he pushed her away. He was finally able to push her away and she grabbed onto the bridge railing. Hall then threw her, shot but still alive, over the bridge railing into the icy Mississippi River.

During an interview with St. Louis County Police Officers, Hall admitted that he and his cohorts discussed "the need to wait for someone to park away from the building so that in the event of a problem, it would be less likely

that they draw attention to themselves." Hall stated that decedent pled with them not to hurt her and repeatedly asked if she would live or die, seeming afraid of the assailants and offering them her credit cards and cash, which were declined. Burton denied being with Hall on the evening of the January 15 and any participation in the incident.

Plaintiffs, decedent's mother and two natural sons, filed suit in the Circuit Court of the City of Saint Louis against Centermark for the wrongful death of decedent. In their petition, plaintiffs alleged that Centermark had a legal duty to take reasonable steps to protect its invitees, tenants and guests of tenants, including decedent, from the criminal acts of third parties, including the assailants. Plaintiffs alleged that this duty was established in one or more of the following ways: (a) the duty was imposed by law on Centermark by the occurrence of numerous violent crimes on its premises, listed in paragraph 30b; (b) Centermark assumed the duty to protect by acquiescing to the policy of Dillard's department store which required employees to park in remote areas and by agreeing, in the "Centermark Safety and Security Policies and Procedures Manual," to pay particular attention to those portions of the parking lot in exercising its security duties; (c) decedent was a third party beneficiary of the contractual agreement between Centermark and Dillard's department store in which Centermark agreed to provide security on the parking lot and to pay particular attention to those portions of the parking lot where Dillard's employees were required to park; (d) since Dillard's was a tenant of Centermark and since the parking lot was a common area over which Centermark retained exclusive possession and control, decedent stood in the same legal position as the tenant, Dillard's, and enjoyed all the same legal rights as Dillard's, including the right to rely on the landlord to take reasonable steps to make the common areas safe from the criminal acts of third persons; (e) the actions of Centermark in acquiescing to and adopting responsibility for Dillard's policy of requiring employees to park in remote portions of the parking lot created a circumstance of extraordinary danger or enhanced the risk of decedent's victimization by crimi-

nals in the parking lot beyond the risk of crime generally; (f) Centermark negligently hired and negligently supervised an incompetent security chief and security staff, whose negligent failure to comply with Centermark's own Safety and Security Policies manual and negligent failure to provide adequate security services directly caused or contributed to cause decedent's abduction.

In paragraph 30b of their First Amended Petition, plaintiffs set forth seventy-seven incidents of alleged criminal activity at or near the mall which took place from January 11, 1989 to January 15, 1994, the date decedent was abducted. These included various incidents of purse snatchings, indecent acts, shoplifting, assault, burglary/robbery and child abuse, but did not include any prior carjackings, abductions, or murders. Of the incidents included in the petition, only one of those taking place on the mall property involved a potential weapon, an incident in which a victim was robbed after exiting her vehicle in Dillard's parking lot. In that instance, the victim told police that an unknown object was placed in the small of her back. The only other incident involving a weapon was an armed robbery which took place on the premises of the "Big and Tall Men's Shop," which is not on the premises of the mall, nor is it owned, operated, or managed by Centermark. We have not been directed to, nor have we found, any other crimes involving a weapon during that time period.

In their Second Amended Petition, plaintiffs added three additional incidents taking place during the same time period as the earlier incidents, including a fraud in progress, purse snatching, and an indecent act in progress. None of these incidents indicate use of any type of weapon.

The record also reveals, although not listed among the crimes in paragraph 30b, that a prior abduction took place at the mall in October of 1984, more than ten years prior to the carjacking, abduction and murder of decedent. A more detailed explanation of the facts of that incident can be found in *Miller v. South County Center, Inc.*, 857 S.W.2d 507 (Mo.App.1993).

Centermark moved for summary judgment, alleging that it was entitled to a judgment as a matter of law based on the material, uncontested facts because Centermark owed no duty to protect decedent from the criminal acts of third parties. Centermark argued that none of the bases alleged by plaintiffs' First Amended Petition are legally sufficient to subject Centermark to a duty of care under the uncontested material facts in this case.

Specifically, Centermark alleged that: (1) a review of the police reports for the prior crimes listed in Paragraph 30b of plaintiffs' First Amended Petition shows a lack of prior crimes "sufficiently numerous, recent, and similar in type" to the carjacking, abduction and murder of decedent to impose a duty of care on the part of Centermark to protect decedent from harm, as an examination of those police reports reveals no other carjackings, abductions, murders or even any incidents involving serious bodily injury of any kind on the mall parking lot; (2) it is not subject to a duty of care under plaintiffs' "assumed duty" exception because as a matter of law, a business which undertakes to have an effective security program does not assume the duty to protect its invitees from third-party criminal assaults; (3) it was not liable under a third-party beneficiary theory because decedent was neither a donee nor a creditor beneficiary of any agreement between Centermark and Dillard's and thus has no enforceable rights under the contract nor does the lease agreement between Dillard's and Centermark contain any provisions in which Centermark agreed to prevent or to be legally responsible for all crimes occurring on the mall parking lot; (4) it is not subject to a duty of care under the theory of landlord liability to make common areas reasonably safe because, as a matter of law, a landlord has no generalized duty to make common areas safe from generally foreseeable dangers such as the threat of crime; (5) it is not subject to liability under an "enhancement of the risk" theory because the condition of danger it allegedly created is no greater than those conditions of danger on the street or in the neighborhood in general; (6) it is not liable under a theory of negligently hiring security personnel, as a matter of law, because the employees in question have not committed a criminal or intentional act, there is no special relationship between decedent and Centermark, and the employees were not directly responsible for the harm suffered.

Centermark submitted the following exhibits in support of its motion for summary judgment: (a) plaintiffs' first Amended Petition; (b) Affidavit of Thomas Lodes, the manager of the mall on January 15, 1994; (c) the lease agreement between Centermark and Dillard's in effect on January 15, 1994; (d) Centermark's Safety and Security Department Policies and Procedures Manual, which was in effect on January 15, 1994; and (e) the police reports for the incidents referred to in paragraph 30b of plaintiffs' First Amended Petition. In his affidavit, Thomas Lodes stated that he was employed as Center manager of the mall on January 15, 1994 and that Centermark did not own, manage or otherwise maintain the following properties: (a) the Big and Tall Men's Shop on South Lindbergh; (b) the Subway Sandwich Shop on South County Way; (c) the Schnuck's Supermarket on Butler Hill Road; (d) the Brod–Dugan Store on South County Centerway; and (e) the McDonald's on Lemay Ferry Road, each places where some of the seventy-seven incidents listed in the police reports actually occurred.

Plaintiffs filed Suggestions in Opposition to Centermark Properties, Inc.'s Motion for Summary Judgment and Supplemental Motion for Summary Judgment alleging that the crimes in question do create a duty under the violent crimes exception. Plaintiffs admitted that the Big and Tall Men's shop, McDonald's and Schnuck's Supermarket are not located on the premises, but maintained that Subway and BrodDugan are on the premises of the mall and the fact that they are not owned, controlled, or maintained by Centermark is irrelevant. In support of their suggestions, plaintiff s also filed a memorandum of law claiming that Centermark was subject, as a matter of law, to a duty under each of the theories listed in Plaintiffs' First Amended Petition; an appendix of attachments which included the police report for decedent's murder; the lease agreement between

Adcor Realty Company and The May Stores Shopping Centers, Inc.; Plaintiffs' First Amended Petition; Plaintiffs' Second Amendment by Interlineation adding three additional crimes; police reports for the crimes referenced in paragraph 30b and the three additional crimes in the Second Amendment; depositions of Centermark personnel concerning security procedure; and affidavits of ten mall employees. The affidavits included the statements of ten employees of Dillard's, who stated that: they were employees on January 15, 1994, they were required by Dillard's to park in an employee parking area; they were uncomfortable parking in the area because they felt it was unsafe being so far from the store entrance and were afraid of becoming "a victim of violent crime;" they agreed to park in the area because it was required by Dillard's; and they relied upon Centermark security to protect them from harm in the parking areas.

Centermark filed a Reply to Plaintiffs' Suggestions and Memorandum of Law in Opposition to Its Motion for Summary Judgment, in which it reiterated its right to summary judgment, arguing that plaintiffs did not raise any issues of material fact in their suggestions in opposition and arguing that the crimes presented by plaintiffs are legally insufficient to establish a duty under the violent crimes exception. Centermark alleged that the five year time period to consider past crimes did not meet the "sufficiently recent standard," as no reported case has applied a time period beyond two or three years. Similarly, Centermark argued that incidents occurring inside the mall and on property not owned by Centermark, non-violent purse-snatchings, consensual fights between youths, incidents involving security personnel and escaping shoplifters should not be considered based on controlling precedent. Looking at the incidents occurring in the past two or three years and exempting the above types of crimes, the remaining crimes are not "sufficiently numerous" to satisfy the violent crimes exception. Centermark also restates that it is not subject to liability as a matter of law under the theories of an assumed duty, third party beneficiary, liability of a landlord for common areas, en-

hancement of the risk, or negligent hiring for essentially the same reasons as it set forth in its motion for summary judgment.

In a written order and judgment supported by a lengthy and detailed memorandum, the trial court granted Centermark's motion for summary judgment, finding that while a massive record had been generated, there really was no genuine issue of material fact. The trial court also found that, as a matter of law, there is generally no duty to protect business invitees from the criminal acts of unknown third persons, but a duty may be imposed by the common law under the facts and circumstances of a given case. The trial court held that plaintiffs failed, as a matter of law, to establish a duty of Centermark under any of their theories of liability, and thus could not prove one of the essential elements to their tort claim for wrongful death, making summary judgment proper.

Plaintiffs contend, in their first point, that the trial court erred in granting summary judgment to Centermark in holding that Centermark owed no duty under the "Prior Criminal Acts" exception to the general no duty rule, because *Madden v. C & K Barbecue Carryout, Inc.*, 758 S.W.2d 59 (Mo.banc 1988), predicates finding of such a duty on proof of prior crimes with elements of violence or potential for violence and plaintiffs have established the existence of sixty such crimes occurring on Centermark's premises over a period of five years prior to decedent's abduction and murder.

In an action for negligence, a plaintiff must establish: (1) a duty on the part of the defendant to protect the plaintiff from injury, (2) failure of the defendant to perform that duty, and (3) injury to the plaintiff resulting from that failure. *Faheen v. City Parking Corp.*, 734 S.W.2d 270, 272 (Mo.App.1987). The dispositive issue here is whether plaintiffs can establish the first element, i.e., whether they can show that Centermark had a duty to protect decedent from injury.

The existence of a duty is purely a question of law. *Aaron v. Havens*, 758 S.W.2d 446, 447 (Mo. banc 1988). Generally, the owner of a business property has no duty to protect an invitee from a deliberate crimi-

nal attack by a third person. *Madden,* 758 S.W.2d at 61. Policy reasons for refusing to impose such a duty include:

> judicial reluctance to tamper with a traditional, common law concept; the notion that the deliberate criminal act of a third person is the intervening cause of harm to another; the difficulty that often exists in determining the foreseeability of criminal acts; the vagueness of the standard the owner must meet; the economic consequences of imposing such a duty; and conflict with the public policy that protecting citizens is the government's duty rather than a duty of the private sector.

*Faheen,* 734 S.W.2d at 272.

■ An exception to the general no-duty rule is the special facts and circumstances exception. *Id.* One theory of this exception is the violent crimes exception, which applies where: (1) there exists some relationship between the plaintiff and the defendant which encourages the plaintiff to come on the premises; (2) there are "prior specific incidents of violent crimes on the premises that are sufficiently numerous and recent to put a defendant on notice, either actual or constructive, that there is a likelihood third persons will endanger the safety of defendant's invitee;" and (3) the incident causing the injury must be "sufficiently similar in type to the prior specific incidents occurring on the premises that a reasonable person would take precautions to protect his or her invitees against that type of activity." *Id.* at 273–274.

Here, neither party contests that there is a relationship between decedent and Centermark that encouraged her to enter the mall premises. She was an employee of Dillard's, a tenant of Centermark. To prevail, plaintiffs must also establish prior specific incidents of violent crimes on the premises that are sufficiently recent, numerous and similar to decedent's injury to put Centermark on notice that there is a likelihood third persons will endanger the safety of its invitees. It is not necessary that the prior crimes be identical to the crime against decedent, but the nature of the criminal acts must share common elements sufficient to place the Centermark on notice of the danger and alert it of the safeguards which are appropriate to the

risks. *Keesee v. Freeman,* 772 S.W.2d 663, 669 (Mo.App.1989).

■ Here, plaintiffs have alleged, over a five year period, 80 incidents of violent crimes, occurring both inside and outside of the mall and in stores located on the mall parking lot not controlled by Centermark. We have defined violent crimes as "assaults, robberies, murder, rape, things such as that, that require some attempt at bodily harm or bodily harm together with whatever else may have occurred, such as a robbery." *Brown v. National Super Markets, Inc.* 731 S.W.2d 291, 294 (Mo.App.1987) (*Brown II*). The indecent acts do not constitute violent crimes under these circumstances because there is no evidence of bodily harm, nor any attempt at bodily harm. We have also held that to be considered under the violent crimes exception, the incident must occur on premises controlled by the defendant. *Keenan v. Miriam Foundation,* 784 S.W.2d 298 (Mo.App. 1990). Additionally, on the basis of relevancy, a prior crime that occurs indoors may be excluded where the incident occurs outside. *Pickle v. Denny's Restaurant, Inc.,* 763 S.W.2d 678, 681 (Mo.App.1988). Further, incidents where bodily harm occurred incident to a criminal's escape attempt may be excluded as well. *Brown II,* 731 S.W.2d. at 294. After excluding all of the incidents off the premises and inside the mall and all incidents of indecent exposure and injuries resulting from escaping shoplifters, there remain about 20 incidents of allegedly violent crimes occurring within the five year period. These crimes include: nine assaults, five purse snatchings, one robbery, one robbery-holdup with the potential use of a weapon, one fight, two strong armed robberies, and one miscellaneous incident, in which a youth attempted to run over a mall employee.

These crimes are not sufficiently similar to the carjacking, abduction and murder of decedent. The nature of these crimes do not share common elements sufficient to place the owner on notice of the danger. *See Keesee,* 772 S.W.2d at 669. Here, there were absolutely no other murders and carjackings during the five years preceding the murder of decedent, and the only abduction was ten years earlier, which we do not consider suffi-

ciently recent for the purposes of this exception. The assaults and the fight for the most part involve mall patrons who exchanged blows with one another after some previous altercation. There is no indication that any of the assaults involved serious or permanent injury; most involved minor cuts and bruises. Also there is no indication of any use of a weapon in the incidents. The five purse snatchings, two strong armed robberies, the robbery and the robbery hold-up involved incidents where the victim's purse, bags, or jewelry were forcibly taken. None of the victims were seriously injured. Only the robbery holdup, where a small, hard object was placed in the victim's back as she was robbed, involves the potential use of a weapon. Centermark could not be expected to be put on notice that a person would be abducted at gun point and then killed based on the occurrence of several purse snatchings and robberies, and a handful of incidents where patrons assault one another, especially where only one of those incidents suggested the potential use of a weapon.

In similar cases involving abductions and assaults or murders, the courts have agreed with this position. In *Faheen,* 734 S.W.2d at 271–272, we held that evidence of arson, assault, robbery, burglary, stealing and various misdemeanors, the majority of which were crimes against property, which were known to the defendant were not sufficient to put the defendant on notice of the risk of murder and car bombing to the plaintiff's decedent. In the cases where a duty was found, courts have found prior crimes with a high degree of force, usually involving a weapon. *See, e.g., Brown v. National Supermarkets, Inc.,* 679 S.W.2d 307, 309–310 (Mo.App.1984) (*Brown I*) (holding that sixteen robberies involving a firearm, seven strong armed robberies and 136 other crimes over a two year period constituted special facts to give rise to a duty to protect plaintiff who was assaulted, battered and shot by an unknown assailant); *Decker v. Gramex Corp.,* 758 S.W.2d 59, 61–63 (Mo.banc 1988) (five armed robberies, four purse snatchings, robbery second degree, attempted armed robbery, assault, assault with a deadly weapon, stealing, and attempted purse snatching sufficient to establish a duty); *Madden,* 758 S.W.2d at 63 (six strong armed robberies, six armed robberies, one assault, and one purse snatching sufficient to establish a duty). There simply were not in this case sufficiently numerous, similar, and recent crimes to put Centermark on notice of the danger of the abduction, carjacking and murder of a mall invitee. Point denied.

In their second point, plaintiffs contend that the trial court erred in granting Centermark's motion for summary judgment, holding that Centermark had not assumed a duty to decedent because under *Keenan,* 784 S.W.2d at 304, a landowner assumes a duty of ordinary care if it directs its invitees to an area it represents to be secure and there is a reliance on that representation. Plaintiffs contend that they presented evidence that: Centermark promised to provide adequate security on the parking lot; Centermark was the only entity allowed to provide security on the lot; Centermark compelled decedent to park in remote areas of the lot; and mall employees were afraid to park in the remote employee parking areas of the lot and relied on Centermark security to prevent criminal attacks while traveling to and from those areas.

Missouri case law supports the proposition that one who acts gratuitously or otherwise is responsible for the negligent performance of the act, even though there is no duty to act. *Keenan,* 784 S.W.2d at 305. Centermark's employment of a security force which had a policy of patrolling those areas does not create an assumed duty. The fact that a business undertakes to have a security program is not equivalent to the assumption of a duty to protect invitees from third party criminal assaults. *Miller,* 857 S.W.2d at 512–513 (Mo.App.1993).

In *Keenan,* 784 S.W.2d at 304, we departed from the general no duty rule and held that under the facts present in that situation, the defendant assumed a duty to plaintiff because of its affirmative personal assurances to protect her from harm. There, plaintiff arrived at defendant's property, which she knew to be a high crime area, to deliver some items for donation. Defendant's employee personally directed plaintiff to enter the back parking lot and told her "there would be

someone there to unlock the gate and help [her] unload the car." Plaintiff expressed reluctance, fearing for her safety, but the employee personally assured plaintiff that she would be safe and that someone would meet her back there to protect her. *Id.* at 304–306.

*Keenan* is distinguishable from the present case, however. There, the defendant personally invited the plaintiff to the area which she was assaulted. Here, plaintiffs admit in their evidence, consisting of affidavits of Dillard's employees, that it was Dillard's which required its employees to park in the employee parking area, not Centermark. Hence, plaintiffs failed to provide evidence to suggest that Centermark invited decedent to park in the parking lot, rather they show only that Centermark failed to object to Dillard's policy. Second, whereas in *Keenan,* where the plaintiff was personally directed at that time to go to the back lot and personally assured at that time that there would be someone to protect her when she got there, here plaintiffs have not produced any evidence, by affidavit or otherwise, that Centermark agreed to assume a "particular duty" to decedent that it would affirmatively undertake to assure her safety in the employee parking area. Point denied.

In their third point, plaintiffs contend that the trial court erred in granting summary judgment to Centermark and finding no duty existed because decedent was a third party beneficiary of the contract between Centermark and Dillard's. Plaintiffs contend that under *Laclede Investment Corp. v. Kaiser,* 596 S.W.2d 36 (Mo.App.1980), one is a third-party beneficiary if the promise was intended to make a gift to the beneficiary, or if the performance of the promise was to satisfy an actual or supposed or asserted duty of the promisee to the beneficiary. Plaintiffs argue that they produced evidence that: the lease between Dillard's and Centermark required Centermark to provide adequate security on the common areas of Centermark's premises, including the remote areas of the parking lot; the lease showed that decedent was a member of an identifiable class of persons intended to benefit from Centermark's promise; and the promise was possibly intended to satisfy Dillard's actual or supposed or asserted duty to decedent.

■ Third party beneficiary is the nomenclature given to one who is not privy to a contract nor to its consideration, but to whom the law gives the right to maintain a claim for breach of contract. *Id.* at 41. Only those third parties for whose primary benefit the contracting parties intended to make the contract may maintain an action. The question of intent is paramount in any analysis of an alleged third party beneficiary situation.

> So '(i)t is not every promise ... made by one to another from the performance of which a benefit may ensue to a third, which gives a right of action to such third person, he being neither privy to the contract nor to the consideration. The contract must be made for his benefit as its object, and he must be the party intended to be benefited.' And the intent necessary to establish the status of a third-party beneficiary is 'not so much a desire or purpose to confer a benefit on the third person, or to advance his interests or promote his welfare, but rather an intent that the promisor assume a direct obligation to him.'

*Id.* at 42 (quoting *Stephens v. Great Southern Savings & Loan Assn.,* 421 S.W.2d 332 (Mo.App.1967)).

■ Inasmuch as persons usually contract and stipulate for themselves and not for third persons, a strong presumption arises that such was their intention, and the implication to overcome that presumption must be so strong as to amount to an express declaration. *Laclede,* 596 S.W.2d at 42.

There are three classifications of third-party beneficiaries: donee, creditor and incidental; however, only the donee and creditor can recover. *Id.* The Restatement of Contracts Section 133, adopted in Missouri as the classification and definition of third party beneficiaries, provides, in pertinent part:

> (1)Where the performance of a promise in a contract will benefit a person other than the promisee, that person is, ...
> (a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the pur-

pose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary.

(b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, ...

Plaintiffs contend that the lease agreement between Dillard's and Centermark granted "privileges and easements to the Tenant [Dillard's] and its 'employees and invitees' ..., including the parking areas." Plaintiffs further contend that Dillard's contracted with Centermark so that Centermark would assume the responsibility of providing security on the premises of the mall. Under the lease terms, Dillard's is required to pay a community area charge, which includes the cost of maintaining, managing and operating the community areas, which includes all costs of policing, security protection and traffic direction. The community areas include the parking lots and are thus paid by Dillard's as part of the community area cost. Centermark is thereby contractually obligated to provide protection for those upon the community areas, such as the parking lots. The clear beneficiary of the security protection, plaintiffs contend, is the class of people entitled to use the parking areas, such as Dillard's employees and customers.

A person is a creditor beneficiary if performance of the promise will satisfy an actual, supposed, or asserted duty of the promisee to the beneficiary. *Hardware Center, Inc. v. Parkedge Corp.*, 618 S.W.2d 689, 693 (quoting Restatement of Contracts, Section 133). Decedent does not fall into this category. Plaintiffs have not presented evidence to suggest that Dillard's owed decedent a duty to be protected against violent crime which Centermark agreed to undertake. Likewise, decedent was not a donee beneficiary. A person is a donee beneficiary of a promise if "the purpose of the promisee

in obtaining the promise is to confer upon the beneficiary the right against the promisor to some performance neither due, asserted nor supposed to due from promisee to the beneficiary." *Id.* (quoting Restatement of Contracts, Section 133). However, the purpose or intent necessary to create a donee beneficiary is the promisee's "intent that the promisor assume a direct obligation to (the beneficiary)." *Stephens v. Great Southern Savings and Loan Ass'n*, 421 S.W.2d 332, 335 (Mo. App.1967). The mere desire to confer a benefit on the third party or to advance his interests or promote his welfare is not sufficient. *Id.* Here, plaintiffs have not presented evidence that Dillard's intended for Centermark to assume a direct obligation to decedent and thus have not overcome the presumption that parties contract soley for their own benefit. Plaintiffs have, at best, demostrated that decedent is an incidental beneficiary to a promise between Centermark and Dillard's, and as an incidental beneficiary, she enjoys no enforceable rights against Centermark. Point three is not meritorious.

We consider plaintiffs' fourth and fifth points concurrently, since they rest on much of the same case law. In their fourth point, plaintiffs contend that Centermark owed a duty to decedent to make common areas reasonably safe against foreseeable risks because, under *Aaron*, 758 S.W.2d at 446, a landlord must exercise ordinary care to make common areas safe as against foreseeable risks if a landlord tenant relationship exists, the landlord retains exclusive control over the premises in question, and the circumstances surrounding the premises exhibit a dangerous condition such that the landlord can foresee future harm to its tenants and its invitees. Plaintiffs further contend that they presented evidence that: a landlord tenant relationship existed between Centermark and Dillard's; Centermark retained exclusive control over the remote employee parking area; and the circumstances surrounding the remote employee area made decedent's abduction foreseeable because of the prior crimes on the lot and because decedent was forced to park in remote areas on the lot far from the mall's main thoroughfares. In their sixth point, plaintiffs contend that Center-

mark enhanced the risk of injury to decedent and thus is subject to a duty from its own active negligence.

■ The general rule is that there is no duty of a landlord to protect its tenants and invitees from criminal assaults from unknown third persons. *Kopoian v. George W. Miller & Company, Inc.,* 901 S.W.2d 63, 70 (Mo. App.1995). *Aaron,* 758 S.W.2d at 447, does not depart from the general rule. *Id.* In *Aaron,* 758 S.W.2d at 447, our Supreme Court held that an owner of an apartment building has a commonly recognized duty to use due care to make common premises safe. There, plaintiff had repeatedly complained to the landlord that the latch on her window was broken so that an intruder could enter her fire escape. *Id.* A burglar had actually obtained access to her apartment through the fire escape before and the landlord was aware of the prior entry, but failed to rectify the problem. *Id.* An intruder entered plaintiff's apartment through the window and raped and sodomized her. The court found that the landlord owed a duty to protect her from that injury. *Aaron* was later clarified in *Kopoian,* 901 S.W.2d at 69–70, where it was noted that traditionally, landlords have been under no duty to provide security for tenants from the criminal activities of third persons. In *Aaron,* the court reasoned, the landlord, which was aware of prior criminal assaults, was actively negligent in enhancing an already present risk of harm to the victim in constructing the fire escape in such a way as to make the tenant more vulnerable to attack.

■ Whereas generally a landlord has no duty to protect tenants from criminal activities of third parties, an exception to this rule exists, however, in the case where a duty has been found to have arisen from special circumstances, such as the landlord's knowledge of previous violent crimes on the landlord's premises. *Id.* Other special circumstances giving rise to a duty may consist of those that exist when the misfeasance of the landlord creates a circumstance of extraordinary danger or enhances the risk of the tenant's victimization beyond the risk of crime victimization generally. *Id.* Here, we have already determined that plaintiffs have

not shown previous similar violent crimes to put landlord on notice of the danger and create a duty to protect. In order to prevail on an "enhancement of the risk" theory, there must be evidence that the landlord's negligence caused a condition of danger consisting of something greater than "that presented out on the street and in the neighborhood generally." *Kopoian,* 901 S.W.2d at 73–74. Crime is a possibility and a threat at all times and in practically every place. *Id.* In *Aaron,* the landlord allegedly created a condition (an easily accessible fire escape) which would uniquely attract criminal activity and increase the vulnerability of the tenant. *Id.* Also, it was the particular kind of risk (unlawful entry as opposed to an assault on the porch) which could reasonably be perceived in advance of the injuries which came to fruition in the criminal acts which occurred.

■ Here, plaintiffs have not produced evidence showing that Centermark's actions created a risk to decedent greater than the risk of crime in general on the street and in the area. Plaintiffs have admitted in the affidavits they filed that it was Dillard's who required its employees to park in remote areas of the parking lot. Further, there is no evidence that the parking policies created any greater risk of crime to decedent than she would have encountered in the neighborhood generally had she not been compelled to park in the remote areas of the mall. The danger in which invitees are exposed to in a parking lot is the same danger to which they are exposed to in the community at large. *Kopoian,* 901 S.W.2d at 74 (quoting *Stanley v. Town Square,* 203 Mich.App. 143, 512 N.W.2d 51, 55 (1993) (holding that association was not liable for injuries to visitor assaulted on a poorly lit parking lot) ). This is unlike *Aaron,* 758 S.W.2d at 446, where the landlord constructed the fire escape in a manner to make the apartment accessible to criminals; without the fire escape, the assailant may not have been able to enter. Similarly, here, unlike the situation in *Aaron,* where the risk of unlawful entry could be foreseen from an easily accessible fire escape in advance of the injury, the risk of carjacking, kidnapping and murder from parking in a lot remote from

the mall is not as similarly foreseeable. Points denied.

JUDGMENT AFFIRMED.

ROBERT G. DOWD, Jr., P.J. and HOFF, J., concur.